JUDGE LINDSAY
delivered the opinion of the court.
B. G. Thomas, a citizen of Kentucky residing in the city of Lexington, some time in the early part of the year 1862, *115 became embroiled in an unfortunate difficulty with a soldier of one of the regiments of United States troops then stationed at that place, and was finally compelled in necessary self-defense to kill the soldier. The act was held to be excusable by both the civil and military authorities, but the comrades of the soldier were so much incensed that they openly announced their intention to avenge his death, and made repeated attempts to execute their threats. Their officers either could not or would not restrain them, and it eventually became necessary that Thomas should virtually abandon his business to escape the impending danger.
While affairs were in this condition the southern army under General Bragg advanced into Kentucky and occupied the city of Lexington. During its occupation Thomas remained at home; but a day or two after it was abandoned by the retiring Confederates, and before the Federal army resumed possession, he started South; and some time in the month of November, 1862, he, being then in the state o,f Tennessee, joined the Confederate army.
On the 5th of November, 1862, Rufus Lisle, a creditor of Thomas, brought his suit in the Fayette Circuit Court, and sued out orders of attachment against his property, upon the grounds that he had left the county of his residence for the purpose of joining, and had joined and entered into, and was then in the service of the army of the so-called Confederate States, and that he had removed and was about to remove a material part of his property out of Kentucky, not leaving enough to pay his debts. The real and personal property of Thomas situated or found in Fayette County was shortly thereafter seized by the sheriff.
On the 14th of December James and Mansfield also filed their suit to enforce the collection of certain notes held by them as assignees of Jackson, the payment of which was secured by a vendor’s lien on a tract of about one hundred *116 acres of land situated near the city of Lexington, and purchased by Thomas from said Jackson. They also procured an order of attachment upon the alleged ground that their debtor had voluntarily left the county of his residence and gone within the lines of the Confederate army, and there voluntarily remained for more than thirty days. In both these suits the land in question was' attached, and in each of them orders of warning against the absent defendant were duly made.
In February, 1863, the two suits were consolidated, and a judgment rendered directing, among other things, the sale of so much of the tract of land already mentioned as might be necessary; the proceeds arising therefrom to be applied, first, to the satisfaction of the lien-notes held by James and Mansfield, and then to the payment of such balance as might remain unpaid on the claim of Lisle after the sale of the personal property. Under this judgment the entire tract was sold, the appellee Mahone purchasing it for the sum of ten thousand six hundred and thirteen dollars. The sale was confirmed, and with the sanction and approval of the court a conveyance to Mahone was executed by the sheriff (who acted as the court’s commissioner) on the 17th of June, 1864.
Shortly after the termination of the civil war Thomas returned to his home, and on the 21st of April, 1870, instituted this suit, seeking to have the judgment and sale under which Mahone claims title to the land declared void, the land restored to his possession, and judgment for such amount as might be found due him after an account for rents and improvements should be rendered. He alleges that at the time of the proceedings resulting in the sale- of his land he was kept away from his home and prevented from making defense by the lawless condition of the country and the inability of the civil and the disinclination of the military authorities to protect him from threatened assassination; that Mahone, the *117 purchaser of his land, had contributed to bring about the condition of lawlessness then prevailing, and was thereby indirectly responsible for his (appellant’s) enforced .absence; that the levies of the orders of attachment were as matter of law void, because of the failure of the officer to comply with the law ih making them, and because the land was at the time in the actual possession of the military authorities of the United States, and therefore not subject to seizure by the officer of the state court; that the military authorities intimidated bidders and prevented competition at the sale; that this fact was a matter of public notoriety, and was well known to the purchaser, who took advantage of the circumstance to bid in the land for greatly less than its actual value; that the premises were in the actual possession of the military when sold; and finally, that the judgment was void for the want of jurisdiction in the court, it not having power, because of his belligerent character and by reason of his absence within the lines of a hostile government, to bring him before or into court by constructive service.
No appeal was prosecuted from the original judgment nor from the judgment confirming the sale of the land; nor did appellant within five years after either of these judgments enter his appearance and move for a retrial of the issues settled by either, as authorized by section 445 of the Civil Code of Practice. Nor is this action in the nature of a bill of review. It is in every essential a collateral proceeding, seeking no correction of errors, and asking no relief except that the original proceedings shall be absolutely ignored. Such being the case, it is not necessary that we should direct our attention to any of the grounds set up in the petition which will not of themselves or in connection with others authorize us to conclude that the judgment or the sale, or both, were and are utterly null and void.
That in 1862 the civil authorities of Fayette County 'were *118 not able to protect appellant from the soldiery, and that the military officers did not afford him protection, is sufficiently proved; yet the hostility toward him seems not to have extended beyond the friends and comrades of the man who had been killed; and it is certain that he remained at home, notwithstanding the apprehended danger, until the command to which these soldiers belonged was compelled to withdraw from Lexington by the advance of the southern troops. He started South at a time when he was in no immediate danger, and when he had no sufficient reason to anticipate the return to Lexington of the hostile soldiers, if indeed they ever did return. But even if prudence dictated that he should secure his personal safety by leaving his home, he could have obtained this security as well within as without the Federal lines. We are constrained to conclude that while he would have preferred to remain at home, if he could have been assured ■ that he would be permitted to do so without further molestation, it was his sympathy for the southern cause, and not fear of the soldiery, that induced him to go'South..
Appellant’s absence within the Confederate lines was not that character of enforced absence which in the case of Dean v. Nelson (10 Wallace, 158) was held by the Supreme Court of the United States to render void the order of publication by which the civil commission sitting at Memphis attempted to acquire jurisdiction of the persons of Nelson and wife. They had been expelled the Union lines by the military commander and were not allowed to return, and therefore could not have obeyed the order of publication, even if it had been brought to their notice.
There is nothing in the record before us authorizing the conclusion that Mahone was responsible for the lawlessness complained of by Thomas, nor that he personally contributed to bring about that disregard by the military of law and order which it is insisted prevailed in Lexington in 1862 and after *119 ward. This court can not recognize and act upon the idea that there is a general equity growing out of the disturbed condition of Kentucky during the late civil war which converts into trustees those who purchased property at judicial sales during that period. To uphold such a doctrine would be to practically reopen all the litigation settled by the courts during that unhappy epoch in our country’s history.
Although the witness Lisle (who was one of the attaching creditors, and who seems to have been the friend of appellant) was induced, by information that he ivas to be arrested by the military authorities, to leave Lexington on the day of the judicial sale, instead of remaining and bidding for the land as he intended to do, the evidence does not show that his contemplated arrest had any thing to do with the sale, nor that it had the effect of intimidating bidders; nor is there any thing proven tending even remotely to connect Mahone with it.
The return of the deputy sheriff upon the order of attachment sued out by Lisle is to the effect that it was levied on “ about one hundred acres of land by delivering a true copy of the within order of attachment to W. A. Warner on the premises,” and on that of James and Mansfield; that it was executed “by delivei-ing to W. A. Warner a true copy of the within order of attachment on the premises of B. G. Thomas.” The 228th section of the Civil Code provides that real property shall be attached “ by leaving with the occupant thereof* or, if there be no occupant, in a conspicuous place thereon, a copy of the order.”
The returns of the sheriff do not show that W. A; Warner was the occupant of the land; but there is nothing in either of them from which it can be inferred that he was not. In such a state of case the presumption must be indulged that the officer made the levies in the mode pointed out by the law, and that the person to whom the copies of the orders of attachment were delivered was the occupant of the premises (Lewis v. *120 Quinker, 2 Metcalfe, 284); and especially should this presumption prevail where the levies are attacked collaterally, it not being permissible in an action of that kind to permit the officer to amend his return, as he would be allowed to do if the objection had been made in the actions in which the attachments were sued out. A different rule would work irreparable mischief. No one would purchase attached property, if parties were allowed in subsequent and collateral litigation to retry the questions of fact which were or might have been contested in the original proceeding.
We are of opinion that the premises were subject to attachment, notwithstanding the Federal Government had upon them at the time a military encampment. The occupation of the military was merely temporary. The General Government asserted no claim to the land actually occupied, and had done nothing indicative of an intention to seize and permanently hold the premises in the furtherance of military operations. Although the officer of the state could not force his way within the guard-lines of the military encampment, yet the occupation of the army was not so exclusive as to prevent him from doing such acts as the law required to be done to put the court in constructive possession of the land; and this was all that was necessary to perfect the attachment liens. If it be true, as charged, that Warner, to whom the deputy sheriff delivered copies of the orders of attachment, was a Federal officer, it is equally clear that he recognized the right of the deputy to make the levies, and, it seems, from the testimony of appellant’s witness Merrill, held possession of the dwelling under the officer of the state court, and surrendered it to the purchaser at the decretal sale. The seizure by the state court did not interfere with the encampment of the Federal troops, and the concurrent possession of the state court and of the troops was in no wise inconsistent with the rights of either. We do not regard the temporary encampment established on *121 appellant’s farm as such a possession by the Federal Government as to compel the process of the state court to pause until the encampment was discontinued. There is no analogy between the facts involved in this and in the cases of Harris v. Denny (3 Peters, 292) and Amy v. Supervisors (11 Wallace, 138).
The further objection that the returns of the officer upon the orders of attachment do not sufficiently describe the land to identify it, however well founded it may be as to the attachment of Lisle, can not avail in this suit. The entire amount for which the land sold was required to pay the lien-notes held by James and Mansfield, and for the satisfaction of these notes the court had jurisdiction to sell it, independent of the lien attempted to be created by its actual seizure under the order of attachment sued out by them.
The only remaining questions necessary to be noticed are, first, could the Fayette Circuit Court entertain jurisdiction of and render judgment in an action prosecuted against Thomas while he was a soldier in the Confederate States army; and second, did the orders of warning sued out against him have the legal effect of constructive service of process ?
It does not follow because appellant was at the time a soldier in the army of a belligerent power, and that all unlicensed communication with him by the people of the states adhering to the Federal Union was inhibited not- only by the laws of war, but by express statute, that resident creditors might not sue him in the courts of this state, and subject to the payment of their debts such of his property as might be found within the local jurisdiction of the court in which he was sued.
The right of resident creditors to so proceed against parties' indebted to them, residing within the lines of this hostile power, and held to be public enemies by reason of their participation in the southern movement, was recognized by the Federal Congress in the act of March 3, 1863 (2 Brightly’s *122 Digest, 1238), providing for the seizure and confiscation of the property of such persons. In the case of Crutcher v. Hord and wife (4 Bush, 362) this court held that a proceeding by a Kentucky creditor to enforce his lien on land situated in this state was not interdicted, notwithstanding the existence of the war and the residence of the debtors within the Confederate lines. And in the case of Burnam v. Commonwealth (1 Duvall, 210) an act of the legislature authorizing suits against the members of the provisional government of Kentucky for the recovery of public revenues seized by them or those claiming to act under them, and the rendition of personal judgments upon constructive service, was declared to be liable to no constitutional objection, although it was applied to persons whose absence from the state within the Confederate lines was as notorious as was the additional fact that they were engaged when the act was passed (March 15, 1862) in giving active aid and encouragement to the hostile government of the South. If the state could authorize such proceedings in its own behalf without contravening the war policy of the General Government, or infringing upon its war powers under the Federal constitution, it is clear that it could provide the same or similar remedies for its citizens. Such has all the while been the opinion of this court, as is manifested by its action in the cases of Bell & Berkely v. Hall’s ex’rs (2 Duvall, 288), Anderson v. Sutton (ibid. 480), Beazley v. Maret (1 Bush, 467), Lusk & Gill v. Salter (2 Bush, 201), Crutchfield v. Thurman (4 Bush, 498), and in numerous others. Even if a citizen of Kentucky who joined the Confederate army became thereby invested with the character of an alien enemy, as is insisted by appellant, it is by no means clear that his property in Kentucky could not be lawfully seized by its courts and subjected to the payment of his debts.
The Supreme Court of the United States, upon the authority of a case in the English court of exchequer, cited in the case *123 of Albrecht v. Sussman (2 Vesey & Beavens, 324), and the doctrine enunciated in Bacon’s Abridgment, title “ Alien,” D, and in the 53d section of Story’s Equity Pleadings, decides that “ whatever may be the extent of the disabilty of an alien enemy to sue in the courts of the hostile country, it is clear that he is liable to be sued.” (McVeigh v. United States, 11 Wallace, 259.)
The jurisdiction of the courts of the state of Tennessee to sell the lands of one of her citizens who had left his home and become a participant in the war being waged against the United States by the Confederates was directly called in question in the case of Ludlow v. Ramsey (11 Wallace, 581), and upheld by the Supreme Court.
The judgment in the case of Dean v. Nelson was declared void because the defendants were not permitted by the military commander to return to Memphis and make defense. Under the circumstances the order of publication was held to be an idle form, not on account of Nelson and wife being public enemies, and therefore not liable to be sued, but because the military would neither allow them to see nor to obey it. So far as the civil or military authorities in Kentucky were concerned, Thomas could have returned and resumed his status as a noncombatant citizen at any time, but he did not choose to do so upon the terms prescribed.
We are satisfied that the power of the courts of the states adhering to the Federal Union to entertain jurisdiction of suits against such of their citizens as joined the Confederate army is upheld by the decided weight of authority.
The validity of the orders of warning made against Thomas depends upon whether the laws of Kentucky regulating the mode of constructive service of process were observed. By an act of the General Assembly, approved December 23, 1861, service in the Confederate army, or voluntarily leaving the county of one’s residence and remaining absent therefrom *124 thirty days within the Confederate States or their military lines, or voluntarily leaving the county of one’s residence for the purpose of joining the army of the Confederate States, or for the purpose of entering their service in either a civil or military capacity, and remaining absent so that the ordinary process of the court could not be served for thirty days, were made grounds of attachment. Said act also provided that warning orders might be obtained on either of said grounds against any defendant to whom they might apply, “in the same manner and with the same effect in all respects, and subject to the same proceedings, as [are now] were then had for existing causes of constructive service.” The 91st section of the Civil Code of Practice, then and now in force, provides “that a defendant against whom a warning order has been made shall be deemed constructively summoned on the thirtieth day after the making of the order, and the action may proceed accordingly.”
That this act was harsh in its nature, and calculated to result in the perpetration of wrongs upon persons who from the very nature of things could not be actually notified of the pendency of suits against them, may be conceded, and yet it does not follow that the courts could rightfully refuse to enforce it. As persons serving in the Confederate army or adhering to the Confederate cause could be lawfully sued, the constructive notice necessary to give the courts jurisdiction to render judgments in suits instituted against them was a question of legislative discretion, and not of power. (Burnam v. Commonwealth.) As the act was intended to apply to belligerents, to persons who were within the lines of the public enemy, the fact that attorneys appointed to defend could not lawfully communicate with them does not render void the judgments in such actions.
That they could not be notified was doubtless one of the reasons inducing the legislature to pass the act. It should *125 also be borne in mind that while the 440th section of the Code provides that “before judgment is rendered against a defendant constructively summoned, and who has not appeared, it shall be necessary to appoint an attorney to defend sixty days before judgment, and to execute to the defendant a bond to the effect that if he appears within the time prescribed by law, makes defense, and sets aside the judgment, the plaintiff shall restore the property taken under it, if the same shall be adjudged to be restored, and pay such sums of money as may be awarded. The appointment of the attorney and the execution of the bond are for the protection of the interests of the absent defendant, and not to give the court jurisdiction.
The jurisdiction is acquired thirty days after the order of warning is made. It is at that time that the defendant is deemed to be constructively summoned. (Section 91, Civil Code.) The local jurisdiction of the court over the thing sought to be sold, and the jurisdiction acquired over the person of the defendant by the constructive service of process provided by law, authorizes the court to proceed, and although the failure to appoint the attorney or to take the bond required by sec. 440 are reversible errors, the jurisdiction being complete, the judgment will not be void. (Bodley’s heirs v. Morris, MS. Opinion, October, 1857.)
The attorney to defend is required to correspond with the defendant, if he can be found; but his failure so to do merely deprives him of the right to compensation, and does not affect the validity of the steps taken by the court. (Brown v. Early, 2 Duvall, 372.)
The warning orders resulting in the judgments, by virtue of which appellant’s land was sold, were based upon the alleged ground that he had departed from the county of his residence, and voluntarily gone and continued within the military lines of the Confederate States. The evidence establishes the truth of these allegations. It does not matter *126 that Thomas remained at home until the advance of Bragg’s troops brought him within the lines of the invading army. He continued a non-combatant citizen of Kentucky until the Confederates left Lexington on their retreat from the state. Whether his remaining at home until the day after the southern troops had retired brought him again within the military lines of the advancing Federáis, or whether his home continued constructively within the southern lines until the Union troops actually re-occupied the country, we do not deem it necessary to decide. He left his home when there was no public enemy present to. interfere with the execution of the process of the courts, and by voluntarily continuing absent and within the hostile lines he forced his creditors to resort to the remedies provided by a law enacted long before he was in any wise connected with the Confederate army. His action brought him within the letter as well as the spirit of the law,' construing it as strictly, and confining its operation within the narrow limits insisted upon by his learned counsel.
The judgment of the circuit court dismissing appellant’s petition must be affirmed.
This cause was decided by Judge Pryor while a circuit judge; hence he did not participate in the action of this court upon the appeal.